AETNA LIFE INSURANCE COMPANY *v.* LITTLE.

Opinion delivered November 8, 1920.

1. INSURANCE—ACCIDENT POLICY—INTENTIONAL KILLING.—Evidence in an action on an accident policy *held* not to support inference that the person who shot insured knew when he fired that he was shooting at the insured.

2. INSURANCE—"ACCIDENTAL" DEFINED.—The term "accidental" in an accident policy is used in its ordinary, popular sense, as meaning happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected; if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it can not be called a result effected by accidental means; but if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means.

3. INSURANCE — PRESUMPTION THAT DEATH WAS ACCIDENTAL.—The death of insured being shown to have resulted from violent and external means, the presumption is that it was accidental.

4. INSURANCE—PRESUMPTION OF ACCIDENTAL DEATH.—The presumption that a death from violent means was accidental may be overcome by proof of circumstances from which the inference might reasonably be drawn that deceased was guilty of conduct which would likely subject him to the injury which he sustained; but the testimony from which the inference is to be drawn that the death was not accidental must be such as to make it reasonable and probable, and not merely speculative or conjectural.

5. INSURANCE — ACCIDENTAL DEATH — NEGLIGENCE OF INSURED.—Recovery on an accident policy is not defeated by the fact that the insured's negligence contributed to his death.

Appeal from Sebastian Circuit Court, Fort Smith District; *John Brizzolara,* Judge; affirmed.

*James B. McDonough,* for appellant.

1. The facts proved do not show that the death of Judge Little was caused by the means provided for or covered by the policy, and the court erred in directing a verdict, as a case for a jury was made by the testimony. 92 Ark. 378; 76 *Id.* 520; 105 *Id.* 213; 112 *Id.* 507; 102 *Id.* 460; 71 *Id.* 445; 119 *Id.* 589; 210 S. W. 350; 120 Ark. 43; 98 *Id.* 370.

2.   Under all the facts of this case, a jury had a right to find that deceased was violating the law of the State in attempting to make an entry into his house, and the evidence is sufficient to sustain such a finding, and the court erred in its instructions given and refused.   214 S. W. 456; 174 N. W. 577; 101 S. E. 134; 179 Pac. 913; 187 *Id.* 1070.   See, also, 185 Pac. 1085; 257 Fed. 225; 177 N. Y. S. 68; 60 Ark. 588.

3.   A directed verdict should have been given for defendant.   108 N. E. 296; 80 Fed. 368; 68 *Id.* 825; 104 Ind. 133; 60 S. W. 570; 81 Atl. 207; 143 Fed. 271.

The court erred in refusing the instructions asked by defendant.  If deceased went to Williams' house for an unlawful purpose, he was not covered by the accident policy.   257 Fed. 225; 108 N. E. 296; 73 Ark. 274; 1 Cyc. 248; 143 Fed. 271.   See, also, 65 So. 852; 177 N. Y. S. 68; 101 S. E. 134; 174 N. W. 577; 120 Mass. 550; 169 U. S. 139; 76 N. W. 683.

4.   Instruction No. 3 for defendant should have been given, as well as No. 4.   Cases *supra.*

5.   It was error to allow the penalty and attorney's fee under the facts of this case.

6.   A case for a jury was made.   113 Ark. 174; 81 *Id.* 87; 99 *Id.* 490; 102 *Id.* 460; 127 *Id.* 286; 107 *Id.* 158; 118 *Id.* 432; 128 *Id.* 347; 222 S. W. 1067; 221 *Id.* 858; 222 *Id.* 51.

7.   If the death was due to an agency of the deceased, it did not result from accidental means.   The cases cited for appellee do not apply.   See cases *supra* and 34 S. E. 113; 143 Fed. 271; 107 Iowa 538; 46 Fed. 446; 80 Fed. 368; 169 Cal. 800; 158 Pac. 1022.

*Pryor & Miles,* for appellee.

If true that Judge Little went to the window of the house and it was a negligent act, yet the insurance company can not plead his negligence in this case.   102 Penn. St. 230.   The cases cited by appellant have no application here, and many of them support the contention of appellee.   1 Am. Rep. 157; 161 Mass. 149; 23 Q. B. Div.

●

453; 127 U. S. 661; 54 Am. Rep. 298. There is nothing to show that Judge Little voluntarily assumed the risk of death. The court properly directed a verdict. 92 Wis. 83; 89 Cal. 101; 93 N. W. 361. If his act was involuntary and unintentional it was an accident. 62 N. W. 807; 28 L. R. A. 78; 38 Am. St. 408; 110 Iowa 224; 81 N. W. 484; 39 Fed. 321; 57 S. W. 614; 85 Fed. 401; 131 Ark. 419. There was no issue to submit to a jury (*supra*), and no error in the instructions.

SMITH, J. This is a suit brought by the appellee, the widow of Judge Paul Little, to recover on an accident policy insuring the deceased "against loss from bodily injuries effected solely through external, violent and accidental means, suicide (sane or insane) not included." Judge Little was shot and killed, and it is the insistence of the appellant that the killing resulted from conduct on the part of Judge Little which, if not wrongful in fact, appeared to be unlawful to the party who killed him, and that the death was not, therefore, due to accidental means.

The facts in connection with the killing, as shown by the testimony in the case, are substantially as follows: The killing occurred at the residence of Guy Williams on Alabama Avenue in the city of Fort Smith, Arkansas, on the night of October 29, 1919. The witnesses vary slightly in their statements as to the hour, but all place it around 9:30 p. m. Williams and his wife had retired for the night, and had extinguished the lights only a few minutes before the killing occurred. About ten minutes after the lights were turned out Judge Little went to the Williams home and, seeing it dark, walked around to the bedroom window and knocked at the window or rattled it, when Williams fired a shotgun through the window and killed Judge Little.

The argument is made that, if Judge Little had wanted to speak to Williams, he could have called him over the telephone, as there were 'phones in both homes, and that if he desired a personal conversation he should have approached the Williams home in the usual way and should

o

have announced his presence by ringing the doorbell, and that, failing in this, he caused Williams to believe that some one was attempting to enter the home with an unlawful or wrongful purpose, and that Williams knew that person to be Judge Little. There was no testimony to show, however, that Judge Little made any effort to enter the home. His acts there were directed to attracting the attention of the occupants of the house, and in this he succeeded, as is evidenced by the consequence of having his presence discovered.

If Judge Little had any improper motive in visiting the Williams home, only two theories can be advanced in explanation. One is that he was about to commit burglary; the other that he sought an assignation. That he entertained either purpose appears to be without any substantial testimony to support it. Judge Little had served the judicial district in which he resided for two terms as its prosecuting attorney, and, at the time of his death, was in the middle of his second term as the judge of that circuit. That he sought an assignation with Mrs. Williams appears as improbable as that he intended to commit burglary. The undisputed testimony is to the effect that he and Williams were brothers-in-law; that Williams was the official stenographer of that district, and, that, as Mrs. Little expressed it, they were "like one big family." The relationship was close and intimate. It does appear that a few days before the killing Williams bought the gun with which he killed Judge Little, but there is no intimation that there had ever been the slightest ill-will or friction between them. There is no intimation that the name of Judge Little had ever been coupled with that of Mrs. Williams in any improper way.

The testimony does show that when Williams first came to the door, and while he still had his gun in his hand, he called out, "What are you doing here?" or words to that effect, and that he did not go to the man who had been shot. But it will be remembered that the killing occurred at night, and late in October. The in-

jured man was lying outside of the house, and on the ground, and Williams was in his pajamas. It appears that an ambulance was promptly called by the neighbors who heard the shooting and came at once to the scene of the killing, and Judge Little was carried to the hospital. There is no intimation that any scene occurred between Williams and his wife, and both were at the hospital within half an hour after Judge Little arrived there.

It is strongly insisted that the testimony of one Frank Hines shows that the killing was not accidental, but was intentional. This witness testified that he lived about a block and a half from the Williams home, and that he was sitting on his front porch when the shot was fired; that he called Williams on the 'phone and asked what the trouble was, and that Williams said he had shot Judge Little. Asked how long that was after the shot he answered, "It must have been five minutes." The witness further testified that he went over to the Williams home, and got there just as the ambulance was leaving, and that Williams and his wife left for the hospital in four or five minutes after he got there.

We do not think this testimony, considered in the light of all the other testimony, would legally support the inference that Williams knew, when he fired the fatal shot, that he was shooting at Judge Little. It is undisputed that several neighbors reached the scene of the killing before Hines did, and that these first arrivals advised Williams whom he had shot, and that Williams thereafter dressed to leave home, and that he was dressed when Hines arrived there, and that these first arrivals, after discovering what had happened, telephoned for the ambulance, and that an interval of from five to fifteen minutes elapsed before the ambulance came. Williams was not called as a witness at the trial, it being shown that he was in Texas at that time.

We have stated the salient facts and circumstances which might be said to support the view that Williams killed Judge Little purposely. Other circumstances are

mentioned in the briefs, but we do not think they are of sufficient evidentiary value to warrant discussion.

The court directed a verdict in favor of appellee, and that action is assigned as error, the insistence being that a case was made for the jury.

This court has had frequent occasion to define the words "accidental injury" and "accidental death." In the case of *Standard Life & Accident Ins. Co.* v. *Schmaltz*, 66 Ark. 595, the court approved an instruction given by the trial court, in a suit on an accident policy, "that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it can not be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means." See, also, *Maloney* v. *Maryland Casualty Co.*, 113 Ark. 174; *Harrison* v. *Business Men's Accident Assn.*, 133 Ark. 163; *Metropolitan Casualty Co.* v. *Chambers,* 136 Ark. 84; *Aetna Life Ins. Co.* v. *Taylor,* 128 Ark. 155.

The insistence of counsel is that the death of Judge Little was brought about by his own agency, that is, that his death was the probable, and not the unexpected, result of his conduct. But the presumption is otherwise. It having been shown that Judge Little died as a result of violent and external means, the presumption is that it was accidental, and the burden is on the insurance company of showing otherwise. *Metropolitan Casualty Co.* v. *Chambers, supra.* Of course, this burden could be discharged (or, at least, a question be made for the jury) by the proof of circumstances from which the inference might reasonably be drawn that the deceased was guilty of conduct which would likely or probably subject him to the injury which he sustained. But, as was said in the case of *Business Men's Accident Assn.*

v. *Cowden,* 131 Ark. 419, the testimony from which the inference is to be drawn must be such as to make it reasonable and probable, and not merely speculative or conjectural. That case was a suit on an accident policy, and the verdict was directed against the insurance company. The policy provided against liability, if the insured met his death from intentional injuries inflicted by himself or others except in an assault committed for burglary or robbery. The insured in that case was found dead in the Missouri River, with a wound on the head and face that penetrated the brain and caused his death. The wound was a sharp and incised wound that did not fracture the bone or tear the flesh. It was there insisted by the insurance company that the jury should have been permitted to say how the insured came to his death. But we said the insurance company had failed to maintain the burden cast upon it to make out a defense, and that the court was correct in directing a verdict in favor of the plaintiff, instead of submitting the case to the conjecture of the jury.

Judge Little may have been guilty of a careless act in going to the window under the circumstances stated; but negligence would not defeat a recovery. See 14 R. C. L., p. 1256, and authorities cited in the note to section 435. It is probably true that the element of carelessness or negligence enters into most accidents, and such policies would be of little value, if the policyholder was insured against the consequences of those accidents only in which his own negligence played no part.

We think that only by conjecture or speculation could the jury have found that Judge Little was guilty of wrongful or unlawful conduct, and if this be true there was no question for the jury, although Williams intended to hit the man at whom he shot.

No error appearing, the judgment is affirmed.